IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,
Plaintiff,

v.

FRANCES M. DIAZ,
Defendant.

Crim. No. 22-085 (FAB)

PLEA AGREEMENT

TO THE HONORABLE COURT:

The United States of America, Defendant, Frances M. Diaz, and Defendant's counsel, Maria A. Dominguez, Esq. and Carlos A. Perez-Irizarry, Esq., pursuant to Federal Rule of Criminal Procedure 11, state that they have reached a Plea Agreement, the terms and conditions of which are as follows:

1. **Charges to which Defendant will Plead Guilty**

Defendant agrees to waive her right to be indicted by a Grand Jury and plead guilty to a one count Information charging the following:

Count One: Conspiracy to Commit Federal Programs Bribery and to Violate the Bank Secrecy Act. Defendant combined, conspired, and agreed with other persons both known and unknown to the United States, to commit offenses against the United States, including:

a) to corruptly give, offer, and agree to give things of value to one or more public officials of the Commonwealth of Puerto Rico, a territory which during each relevant one-year period received federal benefits in excess of $10,000, with the intent of influencing and rewarding the same public official(s) in connection with any

business, transaction, and series of transactions of the commonwealth territory of Puerto Rico valued at $5,000, in violation of 18 U.S.C. § 666(a)(2); and

b) to willfully violate the Bank Secrecy Act, specifically, 31 U.S.C. §§ 5318 and 5322, and regulations issued thereunder, namely 31 C.F.R. § 1020.320, by not filing with the United States Department of Treasury required reports of suspicious activity, in violation of 31 U.S.C. §§ 5318(g); 5322; and 31 C.F.R. § 1020.320.

## 2. Maximum Penalties

The maximum statutory penalty for the offense charged in Count One of the Information is a term of imprisonment of five years, pursuant to 18 U.S.C. § 371; a fine not to exceed two hundred and fifty thousand dollars, pursuant to 18 U.S.C. § 3571(b)(3); and a supervised release term of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2).

## 3. Sentencing Guidelines Applicability



Defendant understands that the sentence will be imposed by the Court in accordance with 18 U.S.C. §§ 3551-86, and the United States Sentencing Guidelines (hereinafter "Guidelines"), which are advisory pursuant to the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005). Further, Defendant acknowledges that parole has been abolished, and that the imposition of Defendant's sentence may not be suspended.

## 4. Special Monetary Assessment



Defendant agrees to pay a special monetary assessment ("SMA") of one hundred dollars ($100.00). The SMA will be deposited in the Crime Victim Fund, pursuant to 18 U.S.C. § 3013 (a)(2)(A).

5. **Fines and Restitution**

The Court may, pursuant to Section 5E1.2 of the Guidelines order Defendant to pay a fine. The Court may also impose restitution. Defendant agrees to execute and make available, prior to sentencing, a standardized financial statement (OBD Form 500). The United States will advocate on behalf of any identified victim and comply with its obligations under the Mandatory Victim Restitution Act of 1996.

6. **Sentence to be Determined by the Court**



Defendant understands that the sentence to be imposed will be determined solely by the United States District Judge. The United States cannot make and has not made any promise or representation as to what sentence Defendant will receive. Any discussions that the parties might have had about possible sentences are not binding in any way on the Court, and do not constitute representations about what the parties will seek, or what the actual sentence will be.



7. **Recommended Sentencing Guidelines Calculations**

After due consideration of the relevant factors enumerated in 18 U.S.C. § 3553(a), the United States and Defendant submit that the advisory Guidelines calculations listed below apply to Defendant. However, Defendant acknowledges that the Court is not required to accept those recommended Guidelines calculations.



U.S. v. Frances M. Diaz

| SENTENCING GUIDELINES CALCULATIONS<br>COUNT ONE<br>18 U.S.C. § 371 | |
|---|---|
| **Conspiracy to Commit Federal Programs Bribery:** | |
| Base Offense Level pursuant to U.S.S.G. §§ 2X1.1, 2C1.1(a) | 12 |
| Offense involved a bribe payment of more than $40,000 pursuant to U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(2) | +6 |
| Offense involved a bribe offered to an elected official pursuant to U.S.S.G. § 2C1.1(b)(3) | +4 |
| Defendant acted in a managerial or supervisory role pursuant to U.S.S.G. §3B1.1(b) | +3 |
| Abuse of position of private trust pursuant to U.S.S.G. § 3B1.3 | +2 |
| Acceptance of Responsibility pursuant to U.S.S.G. § 3E1.1 | -3 |
| Total Adjusted Offense Level for Federal Programs Bribery | 24 |
| **Conspiracy to Violate the Bank Secrecy Act:** | |
| Base Offense Level pursuant to U.S.S.G. §§ 2X1.1, 2S1.3(b) | 8 |
| Defendant acted in a managerial or supervisory role pursuant to U.S.S.G. § 3B1.1(b) | +3 |
| Abuse of position of private trust pursuant to U.S.S.G. § 3B1.3 | +2 |
| Acceptance of Responsibility pursuant to U.S.S.G. § 3E1.1 | -2 |
| Total Adjusted Offense Level for Bank Secrecy Act | 11 |
| **TOTAL ADJUSTED OFFENSE LEVEL** | **24** |

| CH Cat. I | CH Cat. II | CH Cat. III | CH Cat. IV | CH Cat. V | CH Cat. VI |
|---|---|---|---|---|---|
| 51-63 | 57-71 | 63-78 | 77-96 | 92-115 | 100-125 |





8. **Sentence Recommendation**

As to Count One, and after due consideration of the relevant factors enumerated in 18 U.S.C. § 3553(a), the parties agree that a sentence within the stipulated Guidelines Range would constitute a reasonable sentence. However, the parties agree that either party may

seek a variance and suggest that the Court consider a sentence outside of the stipulated Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a).

### 9. No Stipulation as to Criminal History Category

The parties do not stipulate as to any Criminal History Category for Defendant.

### 10. Waiver of Appeal

Defendant knowingly and voluntarily agrees that, if the sentence imposed by the Court is within or below the Guidelines range for the total offense level calculated in this Plea Agreement when combined with Defendant's criminal history category as determined by the Court, Defendant waives the right to appeal any aspect of this case's judgment and sentence, including, but not limited to the term of imprisonment or probation, restitution, fines, forfeiture, and the term and conditions of supervised release.

### 11. No Further Adjustments or Departures

The United States and Defendant agree that no further adjustments or departures to Defendant's total adjusted base offense level—other than any explicitly provided for in this Plea Agreement or accompanying Supplement—shall be sought by Defendant or the United States. The parties agree that any request by Defendant for a departure that is not explicitly provided for in this Plea Agreement will be considered a material breach of this Plea Agreement, and the United States will be free to ask for any sentence, either guideline or statutory.

### 12. Satisfaction with Counsel

Defendant is satisfied with counsel, Maria A. Dominguez, Esq. and Carlos A. Perez-Irizarry, Esq., and asserts that counsel has rendered effective legal assistance.

U.S. v. Frances M. Diaz

### 13. Rights Surrendered by Defendant Through Guilty Plea

Defendant understands that by entering into this Plea Agreement, Defendant surrenders and waives certain rights as detailed in this agreement. Defendant understands that the rights of criminal defendants include the following:

a. If Defendant had persisted in a plea of not guilty to the charges, Defendant would have had the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if Defendant, the United States and the judge agree.

b. If a jury trial is conducted, the jury would be composed of twelve lay persons selected at random. Defendant and Defendant's attorney would assist in selecting the jurors by removing prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges. The jury would have to agree, unanimously, before it could return a verdict of either guilty or not guilty. The jury would be instructed that Defendant is presumed innocent, that it could not convict Defendant unless, after hearing all the evidence, it was persuaded of Defendant's guilt beyond a reasonable doubt, and that it was to consider each charge separately.

c. If a trial is held by the judge without a jury, the judge would find the facts and, after hearing all the evidence and considering each count separately, determine whether or not the evidence established Defendant's guilt beyond a reasonable doubt.

d. At a trial, the United States would be required to present its witnesses and other evidence against Defendant. Defendant would be able to confront those witnesses and Defendant's attorney would be able to cross-examine them. In turn, Defendant could present witnesses and other evidence on Defendant's own behalf. If the witnesses for Defendant would not appear voluntarily, Defendant could require their attendance through the subpoena power of the Court.

e. At a trial, Defendant could rely on the privilege against self-incrimination to decline to testify, and no inference of guilt could be drawn from Defendant's refusal to testify. If Defendant desired to do so, Defendant could testify on Defendant's own behalf.

### 14. Stipulation of Facts

The accompanying Stipulation of Facts signed by Defendant is hereby incorporated





into this Plea Agreement. Defendant adopts the Stipulation of Facts and agrees that the facts therein are accurate in every respect. Defendant agrees and accepts that had the matter proceeded to trial, the United States would have proven those facts beyond a reasonable doubt.

15. **Limitations of Plea Agreement**

This Plea Agreement binds only the United States Attorney's Office for the District of Puerto Rico, the Public Integrity Section of the Criminal Division of the U.S. Department of Justice, and Defendant. It does not bind any other federal district, state, or local authorities.

16. **Entirety of Plea Agreement**



This written agreement constitutes the complete Plea Agreement between the United States, Defendant, and Defendant's counsel. The United States has made no promises or representations except as set forth in writing in this Plea Agreement and accompanying Supplement.

17. **Amendments to Plea Agreement**



No other promises, terms or conditions will be entered into between the parties unless they are in writing and signed by all parties.

18. **Voluntariness of Plea Agreement**

Defendant acknowledges that no threats have been made against Defendant and that Defendant is pleading guilty freely and voluntarily because Defendant is guilty.

19. **Breach and Waiver**

Defendant agrees that defendant will have breached this Plea Agreement if, after entering into this Plea Agreement, Defendant: (a) fails to perform or to fulfill completely each

and every one of Defendant's obligations under this Plea Agreement; (b) engages in any criminal activity prior to sentencing; or (c) attempts to withdraw Defendant's guilty plea. In the event of such a breach, the United States will be free from its obligation under this Plea Agreement and Defendant will not have the right to withdraw the guilty plea. Moreover, Defendant agrees that if Defendant is in breach of the Plea Agreement, Defendant is deemed to have waived any objection to the reinstatement of any charges under the Indictment, Information, or complaint which may have previously been dismissed or which may have not been previously prosecuted. Additionally, in the event of such a breach, the United States will be free to use against Defendant, directly and indirectly, in any criminal or civil proceeding, all statements made by the defendant and any of the information or materials provided by the defendant at any time, including such statements, information, and materials provided pursuant to this Plea Agreement or during the course of any interviews, conversations, or debriefings conducted in anticipation of, or after entry of this Plea Agreement, including the defendant's statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The defendant understands that Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. Defendant knowingly and voluntarily waives the rights arising under these rules.

### 20. Potential Impact on Immigration Status

Pursuant to Federal Rule of Criminal Procedure 11(b)(1)(O), Defendant hereby agrees and recognizes that if convicted, a Defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United

U.S. v. Frances M. Diaz

States in the future.

### 21. Felony Conviction

Defendant hereby agrees and recognizes that the plea of guilty in this case will be recognized as a felony conviction, which will result in the loss of certain rights, including, but not limited to, the right to vote in a federal election, to serve as a juror, to hold public office, and to lawfully possess a firearm.

### 22. Forfeiture Provision

The parties agree to recommend to the Court that forfeiture not be required as a component of Defendant's sentence.

W. STEPHEN MULDROW
United States Attorney

_____
Seth Erbe
Assistant U.S. Attorney
Chief, Financial Crimes and
And Public Corruption
Dated:

_____
Nicholas Cannon
Assistant United States Attorney
Dated:

COREY R. AMUNDSON
Chief, Public Integrity Section
Department of Justice

_____
Erica O. Waymack
Trial Attorney
Dated:

_____
Ryan R. Crosswell
Trial Attorney
Dated:

U.S. v. Frances M. Diaz

_____
Maria A. Dominguez, Esq.
Counsel for Defendant
Dated: 2·28·2022

_____
Carlos A. Perez-Irizarry, Esq.
Counsel for Defendant
Dated: 28 Feb 2022

_____
Frances M. Diaz
Defendant
Dated: 2/28/2022

U.S. v. Frances M. Diaz

## UNDERSTANDING OF RIGHTS

I have consulted with counsel and fully understand all of my rights as to the charges pending against me. Further, I have consulted with my attorney and fully understand my rights as to the provisions of the Guidelines that may apply in my case. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I fully understand this agreement and voluntarily agree to it.

Date: 2/28/2022

_____
Frances M. Diaz
Defendant

I am the attorney for Defendant. I have fully explained Defendant's rights to Defendant with respect to the Information filed in this case. Further, I have reviewed the applicable provisions of the Guidelines and I have fully explained to Defendant the provisions of those Guidelines that may apply in this case. I have carefully reviewed every part of this Plea Agreement with Defendant. To my knowledge, Defendant is entering into this Plea Agreement voluntarily, intelligently, and with full knowledge of all consequences of Defendant's plea of guilty.

Date: 2/28/2022

_____
Maria A. Dominguez, Esq.
Counsel for Defendant

Date: 28 Feb 2022

_____
Carlos A. Perez-Irizarry, Esq.
Counsel for Defendant

## STIPULATION OF FACTS

In conjunction with the submission of the accompanying Plea Agreement in this case, Defendant Frances M. Diaz ("Defendant") admits that she is guilty as charged in the Information. Defendant admits the following:

1. During the relevant time period of approximately December 2019 through August 2021, Defendant was the President and Chief Executive Officer of an international bank ("The Bank").

2. The Bank was an international bank, classified as an International Banking Entity ("IBE") under Puerto Rico's International Center Bank Regulatory Act of 1989. The Bank was wholly-owned by a holding corporation organized in San Juan, Puerto Rico. The holding company was, in turn, wholly owned by a parent corporate entity company located in the United Kingdom.



3. Individual A was the ultimate owner of The Bank and the Chairman of its Board of Directors. Individual A had authority and control over The Bank. Individual A was a foreign national and not a citizen of the United States.

4. Individual B was a political consultant located in Puerto Rico whose clients included the Puerto Rico House of Representatives and Senate and the Puerto Rico Department of Housing within and prior to the relevant time period.

5. Witness 1 was the owner of a Washington, D.C.-based accounting and consulting firm, who also set up independent expenditure-only political action committees. Witness 1 served as the treasurer of a political action committee that was established in or around May 2020 to support the candidacy of Public Official B ("The PAC"). Witness 1 engaged in the conduct described below at the direction of federal law enforcement

authorities.

6. Public Official A was a public official in the executive branch of the government of Puerto Rico whose official responsibilities included, but were not limited to, overseeing various agencies of the government of Puerto Rico, including selecting, nominating, and appointing heads of such agencies.

7. Public Official B was an elected public official in the executive branch of the government of Puerto Rico whose official responsibilities included, but were not limited to, overseeing various agencies of the government of Puerto Rico, including selecting, nominating, and appointing heads of such agencies.

8. The Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF") supervises and regulates the banking system in Puerto Rico.

9. The Bank Secrecy Act ("BSA") and regulations promulgated thereunder were enacted by Congress to address an increase in money laundering through financial institutions. Among other requirements, the BSA required financial institutions to report suspicious transactions through the filing of Suspicious Activity Reports ("SARs") with the Financial Crimes Enforcement Network of the U.S. Department of Treasury ("FinCEN"), on any "suspicious transaction relevant to a possible violation of law or regulation." FinCEN has overall authority for enforcement of the BSA.

10. In or around July 2019, the Commissioner of OCIF initiated an examination of The Bank. The examination concluded on or around September 18, 2020. The examination identified numerous areas at The Bank that OCIF determined required corrective action. Among other things, as part of the examination OCIF identified dozens of financial transactions The Bank conducted on behalf of its customers that OCIF deemed

suspicious and that The Bank did not report as required by the BSA. Several of these financial transactions involved bank accounts and entities owned or controlled by The Bank's owner, Individual A.

11. A negative examination by OCIF could have had consequences for the Bank, including requiring the Bank to take corrective action, subjecting the Bank to an enforcement action by OCIF that could include financial penalties, negatively impacting the Bank's ability to maintain its limited access to Fedwire or receive more comprehensive access to Fedwire, and potentially resulting in the loss of the Bank's license to operate as an IBE.

12. Between approximately December 2019 and approximately June 2020, Individual A, through intermediaries, offered financial support to Public Official A. Individual A, Defendant, and others sought to have Public Official A terminate the Commissioner of OCIF and replace him with a new commissioner of Individual A's choosing. In fact, Public Official A replaced the Commissioner of OCIF with a new OCIF Commissioner selected by Individual A.



13. After Public Official A lost in the primary election, Individual A decided to financially support the federal political action committees supporting both Public Official B and Public Official B's opponent in the general election.



14. Public Official B won the general election in November 2020. After Public Official B's election, Individual A, through intermediaries, including Defendant, sought to influence the OCIF examination by making a $25,000 payment to pay for the remaining debt incurred by The PAC during Public Official B's 2020 campaign specifically in exchange for, among other things, OCIF ending its examination on terms favorable to The Bank, including relieving The Bank of the requirement of filing certain SARs, as required by the Bank Secrecy



Act. Defendant served as an intermediary for Individual A in conveying the offer of a bribe to Witness 1, who was acting at the direction of law enforcement agents and not on behalf of Public Official B and whom Defendant believed to be an intermediary for Public Official B. The acts taken by Defendant and her co-conspirators in furtherance of the conspiracy include the following:

15. On or about April 30, 2021, Defendant and Individual B met with Witness 1, who they understood to be a fundraiser for Public Official B, along with several other interested persons, at The Bank's office in San Juan, Puerto Rico to discuss OCIF's examination of The Bank. During the meeting, Defendant and Witness 1 discussed four objectives that The Bank wished to accomplish: 1) that The Bank would not need to sign a Memorandum of Understanding with OCIF regarding The Bank's deficiencies; 2) that The Bank would not need to file SARs for certain financial transactions involving bank accounts and entities owned or controlled by Individual A; 3) that OCIF's examination of The Bank would end; and 4) that certain employees of OCIF would be removed from their positions.

16. On or about May 12, 2021, Individual B sent Witness 1 a text message asking if Witness 1 had been able to discuss the matter with "the boss," referring to Public Official B. To further the investigation, Witness 1 responded that he had, and that he would follow up with Public Official B regarding the timeline for accomplishing three of The Bank's four objectives. In the same conversation, Witness 1 reminded Individual B "to give me a hand with the contribution."

17. Between May 18 and May 24, 2021, Defendant and Witness 1 exchanged text messages for the purpose of setting up another in-person meeting to discuss The Bank's requests which The Bank intended to be conveyed to Public Official B to influence the OCIF

examination.

18. On or about May 27, 2021, Defendant and Individual B met with Witness 1 at a restaurant in Guaynabo, Puerto Rico, to discuss The Bank's requests which The Bank intended to be conveyed to Public Official B to influence the OCIF examination. During the May 27 meeting, Witness 1 discussed an agreement with Defendant and Individual B for a $50,000 payment to The PAC intending that the payment be in exchange for Public Official B directing and exerting influence on public officials to cause the four specific objectives that The Bank wished to accomplish: 1) that The Bank would not need to sign a Memorandum of Understanding with OCIF regarding The Bank's deficiencies; 2) that The Bank would not need to file SARs for certain transactions involving bank accounts and entities owned or controlled by Individual A; 3) that OCIF's examination of The Bank would end; and 4) that certain employees of OCIF would be removed from their positions.

19. During the May 27 meeting, Witness 1 stated that Individual A, Individual B, and Defendant should let Witness 1 know when they were ready to make the payment to The PAC. To further the investigation, Witness 1 represented that at that point, Public Official B could move forward with The Bank's requests with respect to OCIF. Defendant responded, "We are already there."

20. At the May 27 meeting, in response to Witness 1's request for an assurance that Individual A was aware of the agreement, Defendant responded that Individual A was knowledgeable about the discussions and "clear on what the requests are." Witness 1 stated that what they were discussing "cannot leave this table," and Individual B responded by acknowledging the need for secrecy, stating that it would not be convenient for The Bank if it was publicly known "that [Public Official B's office] is intervening in any way." Witness 1



told Defendant and Individual B that he would send them information for wiring the money that The Bank was pledging for Public Official B. Defendant told Witness 1 to send the information only to Individual B. When Witness 1 indicated that he did not like to talk or text about "this" on the phone, Defendant stated, "Exactly. One never knows who might be listening."

21. On or about May 28, 2021, Witness 1 sent Individual B via text message the wiring instructions for the account into which The Bank's payment to The PAC should be deposited.

22. In or around May or June 2021, Defendant informed Individual A of Witness 1's representation that in exchange for Individual A's $50,000 payment to The PAC, Public Official B would ensure that 1) The Bank would not need to sign a Memorandum of Understanding with OCIF; 2) The Bank would not need to file certain SARs for transactions related to bank accounts and entities owned or controlled by Individual A; 3) OCIF's examination of The Bank would be resolved on terms favorable to The Bank.

23. In or around July 2021, Individual A, the owner of The Bank, decided to make a $25,000 payment to The PAC from an account held in the name of The Bank. Individual A suggested in a text message to Defendant that he would authorize the remaining $25,000 of the $50,000 payment to The PAC only after Public Official B delivered on The Bank's requests.

24. On or around August 11, 2021, Individual A caused a $25,000 wire to be sent to The PAC from an account held by The Bank's holding corporation.

25. As a result of the $25,000 payment to The PAC's bank account, which Defendant understood to be a payment to support Public Official B's campaign, Defendant,

Individual A, and Individual B expected the OCIF examination of The Bank to be resolved in terms favorable to The Bank.

26. Defendant acknowledges that the BSA requires the reporting of suspicious banking transactions conducted or attempted by, at, or through a bank which involve or aggregate to at least $5,000 in funds or other assets. Through this bribery scheme, Defendant and her co-conspirators sought to ensure that no adverse actions would be taken against The Bank by OCIF as a result of OCIF's examination. The potential adverse actions, which were communicated to The Bank by OCIF, potentially included a fine of more than $5,000. In addition, Defendant acknowledges that pursuant to 52 U.S.C. § 5321(a)(1), Bancredito's willful failure to file SARs could have included a civil penalty of up to the greater of the amount involved in the transaction (not to exceed $100,000) or $25,000.

27. In the years 2019, 2020, and 2021, the commonwealth territory of Puerto Rico received in excess of $10,000 under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

_____
Ryan R. Crosswell
Trial Attorney
Dated: 3/1/22

_____
Erica O. Waymack
Trial Attorney
Dated: 3/1/22

_____
Nicholas Cannon
Assistant United States Attorney
Dated: 3/1/22

_____
Maria A. Dominguez, Esq.
Counsel for Defendant
Dated: 2/28/2022

_____
Carlos A. Perez-Irizarry
Counsel for Defendant
Dated: 28 Feb 2022

_____
Frances M. Diaz
Defendant
Dated: 2/28/22